OPINION OF THE COURT
Robert A. Contiguglia, J.
On March 29, 1983 the Court of Appeals (58 NY2d 316) affirmed in all respects the decision of the Appellate Division in this case (86 AD2d 110) — determining that the unconstitutional taxes paid voluntarily and not under protest could not be recovered as a matter of legal right. The remaining issue regarding the rights of “nonprotestors”, remanded to me by the Appellate Division, is whether the city may nonetheless legislatively recognize their claims as equitable or moral obligations within the meaning of subdivision 5 of section 20 of the General City Law, which provides in relevant part: “Grant of specific powers. Subject to the constitution and general laws of this state, every city is empowered: * * * 5. * * * to pay or compromise claims equitably payable by the city, though not constituting obligations legally binding on it”. Upon the entire record and for the reasons which follow, I hold that the city may so *258 recognize these claims and that it has properly done so. First, however, some background is required.
For four fiscal years the City of Rochester exceeded its constitutional taxing limitation (1974-1975 through 1977-1978). Approximately 30% of its total tax bills in each of these years was invalid. There is no dispute that the city spent the sums illegally collected for municipal purposes benefiting all taxpayers — protestors and nonprotestors alike. The city estimates that more than $100,000,000 was illegally collected with approximately half of this sum having been paid by the nonprotestors.
Then Waldert v City of Rochester (44 NY2d 831) was decided by the Court of Appeals in May of 1978, more than one month after the last installment of taxes was due for the last fiscal year in question. While the Appellate Division had declined to order refunds to the taxpayer plaintiffs in Waldert, the Court of Appeals held otherwise, citing the fact that Hurd v City of Buffalo (34 NY2d 628) had put the city on notice of the infirmity of the general taxing scheme employed.
With the refunds ordered by Waldert came the handwriting on the wall: the city was clearly liable to its many thousands of taxpayers who, like the plaintiffs in Waldert had protested the payment of their taxes, and it was possibly liable to those who had not. Though in Hurd and Waldert there was dicta to the effect that only those who protested might recover, there were no nonprotestors represented in either case, and at least a reasonable doubt existed as to whether their rights were thus precluded.
The city’s response to its potential liability for the last two of the fiscal years in question was to enact Ordinance No. 79-307. In it, the city recognized the claims of all taxpayers as equitable obligations using the following language: “whereas, this City Council hereby determines that the declaration of such taxes as unconstitutional establishes an equitable claim upon the City on behalf of all real property taxpayers within the City to a refund of such unconstitutional taxes”. While the ordinance was ultimately ruled unconstitutional for other reasons in Angelone v City of Rochester (72 AD2d 445, 449) the Appellate Division had this to say regarding the recognition of the *259 claims of nonprotestors by the city as equitable obligations: “Although only those taxpayers who paid their taxes ‘under protest’ are legally entitled to a refund, arguably the city would have authority under statute to return unconstitutionally assessed taxes to the taxpayers who paid them regardless of whether they had the foresight to pay ‘under protest.’ ” The Court of Appeals in Angelone, apparently in consideration of the inseparable nature of Ordinance No. 79-307, specifically declined to rule on whether the payment of equitable claims of nonprotestors would pass constitutional muster (Angelone v City of Rochester, 52 NY2d 982).
With the Appellate Division decision in Angelone the city’s liability was expanded from two to four fiscal years. The Appellate Division decision came on the eve of the expiration of the six-year Statute of Limitations applicable to refunds of taxes, for the first of the four years (Matter of First Nat. City Bank v City of New York, 36 NY2d 87). The city’s option to achieve a governmental solution to the problem at hand was therefore coming to a close, at least if it wished to fulfill its avowed intention to treat all taxpayers equally. It could readily be expected that the expiration of the Statute of Limitations would forever foreclose many unwitting taxpayers from any entitlement to refunds.
Anticipating this and the flood of litigation that was certain to follow the Appellate Division decision in Angelone, the city commenced this reverse class action against all of its taxpayers who paid the unconstitutional taxes, before the expiration of the Statute of Limitations. In turn, all taxpayers served counterclaims seeking refunds, again prior to the expiration of the Statute of Limitations. The city’s complaint specifically named, among others, a representative of all those who failed to pay under protest. In it, the city sought declaratory relief that if it was unsuccessful in the then pending appeal to the Court of Appeals in Angelone, the court would direct a method of payment according to a plan to be proposed by the city.
After Angelone was affirmed, this court ordered the city to submit the “Plan of Refund” proposed by its complaint. The plan thereafter submitted, proposed to pay all taxpayers 50% of their claims for all four years regardless of their *260 failure to protest. Though the city denied any legal liability to pay nonprotestors, consistent with its avowed policy it proposed nevertheless to do so pursuant to the authority of subdivision 5 of section 20 of the General City Law.
When this court certified the class action, its order deferred consideration of the city’s refund plan until the final disposition of the interrelated threshold questions: (a) whether protest was legally required under the facts of this case, and (b) if it was, whether the city could nonetheless legally pay nonprotestors as it proposed to do in its plan under subdivision 5 of section 20 of the General City Law. As noted above, the decision by the Court of Appeals in this case that protest was required now brings into focus the issue of the city’s ability to pay nonprotestors at all under subdivision 5 of section 20 of the General City Law.
In order to implement its plan in the aftermath of the Court of Appeals recent decision and to bring the next issue before the court in concrete form, the city council unanimously adopted Ordinance No. 83-162 (May 10, 1983) which reads in full as follows:
“whereas, from July 1, 1974 through June 30,1978, the City of Rochester levied and collected certain real property taxes pursuant to the authority of state legislation declared unconstitutional in Waldert v. City of Rochester, 44 NY2d 831 (1978), and Angelone v. City of Rochester, 52 NY2d 982 (1981); and
“whereas, many city property owners did not protest appropriately when they paid their taxes, resulting in approximately 45 million dollars of unprotested unconstitutional taxes being paid over the four year period; and
“whereas, a counterclaim for refunds of those unconstitutional taxes was pleaded on behalf of all those non-protestors in a class action entitled City of Rochester v. Chiarella, brought and pending in Supreme Court, Monroe County; and
“whereas, the Court of Appeals has now affirmed (March 29,1983), in the first phase of the class action, that the City is not bound to make tax refunds to these non-protestors as a matter of legal obligation; and
*261 “whereas, the City of Rochester has since 1978 consistently declared its policy to be to make refunds equally to all who paid unconstitutional taxes, as a matter of fairness, regardless of whether they protested;
“now, therefore, be it ordained, by the Council of the City of Rochester as follows:
“Section 1. Pursuant to the authority of General City Law Section 20(5) ‘to pay or compromise claims equitably payable by the City, though not constituting obligations legally binding on it’, the City of Rochester hereby recognizes the counterclaim of the non-protestors, pleaded in the class action and seeking refunds of the unconstitutional taxes levied and collected from 1974 to 1978, as a claim equitably payable by the City, and, further, authorizes payment of such claim solely from the City’s special fund for tax refunds in an amount determined by an order of compromise ultimately to be made and entered in the pending class action.
“Section 2. This ordinance shall take effect immediately.”
Subclass A-l challenges this legislation and any recognition by the city of the claims of nonprotestors as an unconstitutional gift, prohibited by section 1 of article VIII of the New York Constitution. This section provides in part as follows: “No county, city, town, village or school district shall give or loan any money or property to or in aid of any individual, or private corporation or association, or private undertaking”.
Resolution of this issue requires a determination whether the claims of nonprotestors asserted by counterclaim in this action may be regarded as “moral obligations”, “equitable claims”, or “claims founded in equity and justice” as defined by the cases. This is because the courts have long acknowledged the authority of the State and its municipal subdivisions to legislatively pay equitable or moral obligations without violating the constitutional proscription against the making of gifts (e.g., Matter of Chapman v City of New York, 168 NY 80; Wrought Iron Bridge Co. v Town of Attica, 119 NY 204; Evans v Berry, 262 NY 61; Matter of Shaddock v Schwartz, 246 NY 288). The rationale underlining the equitable claims principle was *262 summarized by Chief Judge Hiscock in Williamsburgh Sav. Bank v State of New York (243 NY 231, 240): “Fortunately, and creditably to them, our courts have firmly established the proposition that the State as well as an individual may be honorable and may voluntarily recognize just obligations which it fairly and honestly ought to pay even though they do not constitute purely legal claims such as in the case of an individual could be enforced under the compulsion of judgment and execution. By appropriate constitutional provisions taxpayers are protected against waste and extravagance which might result from some passing or mistaken impulse upon the part of the Legislature to make gifts. But when a claim is presented which securely rests upon a foundation of equity and justice and which involves what we have come to define as a moral obligation, it may be recognized without infringing upon these provisions and the State may pursue the same course of honorable conduct as would an individual.” (Emphasis supplied.)
The power to recognize equitable or moral claims has expressly been delegated to cities by subdivision 5 of section 20 of the General City Law (Evans v Berry, supra, p 67); but even before the passage of this enactment it seems to have been well settled that cities had the power to legislatively recognize equitable or moral claims without violating section 1 of article VIII (People ex rel. Central Trust Co. v Prendergast, 202 NY 188, 197; Matter of Borrup, 182 NY 222).
While the State and cities clearly have this theoretical power, they nevertheless may only exercise it when the claims at issue are true moral obligations (Ausable Chasm Co. v State of New York, 266 NY 326; Corning v Village of Laurel Hollow, 48 NY2d 348). Guidance on the question as to what constitutes a moral obligation has been provided by the following statements of the Court of Appeals in Ausable Chasm Co. v State of New York (supra, pp 330, 331):
“Such terms as ‘moral obligation’ and obligations ‘founded on justice and equity’ are flexible. They serve to formulate the problem rather than to provide the formula by which the problem may be solved. No yardstick has ever *263 been devised which can be mechanically applied. None the less, in every case there must exist an obligation which would be recognized, at least, by men with a keen sense of honor and with real desire to act fairly and equitably without compulsion of law. The Constitution does not prohibit the Legislature from doing in behalf of the State what a fine sense of justice and equity would dictate to an honorable individual. It does prohibit the Legislature from doing in behalf of the State what only a sense of gratitude or charity might impel a generous individual to do.
“Benefit enjoyed at the expense of another will ordinarily call for compensation. Even where the law does not compel such compensation, justice and equity may still dictate its payment.” (Emphasis supplied.)
And in Matter of Green (166 NY 485, 494): “The distinction between the gratuity which the Constitution now forbids and the meritorious claim which it permits municipal bodies to satisfy, notwithstanding judgment adverse to the claimant, is apparent. Where such final judgment is on the merits, for the legislature to vacate or disregard it and direct the levy of a tax to pay it, either without a new trial or with judgment upon it, would be the bestowal of a gratuity. But where such judgment is not upon the merits, but because of some defect in the authority of the officers to bind the municipal body for which they assume to act, and thus in good conscience is not decisive against the justice of the claim, the legislature may, in order that justice shall prevail, direct its re-examination and determination, and, if found to be just, direct that it be provided for by taxation.” The rule therefore seems to be that a claim which is legally unenforceable solely for procedural or technical defects may be a moral obligation, whereas one which is legally unenforceable on the merits or substantively may not. It follows that subdivision 5 of section 20 of the General City Law authorizes a city to waive procedural or technical defects (other than the expiration of the Statute of Limitations) in the assertion of a claim that would ordinarily bar the claim from becoming a legal obligation upon the city, and to honor the claim if it is “equitably payable”, that is, if it has underlying substantive merit.
*264 The issue as to whether the claims of nonprotestors for refunds of unconstitutional taxes in this case are “moral obligations”, “equitable claims” or “claims founded in equity and justice” is fully resolved by People ex rel. Eckerson v Board of Educ. (126 App Div 414, affd 193 NY 601). In that case it was contended that taxes voluntarily paid could not be refunded by the Legislature. The Appellate Division rejected this contention holding (126 App Div, at pp 418-419):
“The mere fact that the tax was paid voluntarily does not debar the Legislature from providing for a refund of that part which is excessive. (Cooley Taxn. [2d ed.] 753; Matter of Adams v. Supervisors, 154 N. Y. 626.)
“The moral obligation to refund an excessive tax is just as strong whether it was paid voluntarily or by duress, for the ground thereof is a payment beyond that which should in justice have been charged.
' “Determining from a legal adjudication to that effect that the basis of the tax was excessive, the Legislature has deemed that a moral obligation exists and has given it legal effect by a retroactive statute. The principle that such a statute is within the Legislature’s power is well settled * * * The argument that when payment was voluntary such a refund should not be ordered is one addressed to the Legislature, not the courts.”
Certainly, if protesting taxpayers were injured by the imposition of an unconstitutional tax, nonprotesting taxpayers were no less injured. Moreover, by the payment of their taxes, the nonprotestors conferred a benefit, not only on the city itself, but also, in reality, on their fellow protesting taxpayers. Their moneys as well as the moneys of protestors were used for municipal services which were rendered on behalf of all taxpayers, protestor and nonprotestor, alike. As the Court of Appeals noted in the above-quoted language in Ausable Chasm (266 NY, at p 331) “[b]enefit enjoyed at the expense of another will ordinarily call for compensation.”
*265 Furthermore, protest is merely a “procedural requirement” and “omissions to protest do not affect the justice and equity of the claims at bar” (Evadan Realty Corp. v Patterson, 192 Misc 850, 856, affd 276 App Div 751). The taxes collected from protestors and nonprotestors alike were unconstitutional. Failure to protest their payment does not somehow render the taxes constitutional as to nonprotestors. The nonprotestors’ claim for refunds continues to have underlying substantive merit even though the procedural defect of failure to protest bars legal enforcement of their claim.
When the Federal Government statutorily abolished the common-law and statutory requirements making protest a condition precedent to the recovery of a tax, Justice Cardozo spoke of protest and the statute abolishing its requirement, thusly:
“In this situation the Government was unjustly enriched at the expense of the taxpayer when it held on to moneys that had been illegally collected, whether with protest or without. So at least the lawmakers believed, and gave expression to that belief, not only in the statute, but in Congressional reports.
* * *
“A high-minded Government renounced an advantage that was felt to be ignoble, and set up a new standard of equity and conscience * * * A fine sense of honor had brought the statute into being. We are to read it in a kindred spirit.” (Moore Ice Cream Co. v Rose, 289 US 373, 378-379.)
Just as did the Legislatures in Moore Ice Cream and in Eckerson, the City Council of the City of Rochester has perceived an inequity and has deemed that a “moral obligation exists and has given it legal effect by a retroactive statute.” This, according to the authorities, it had every right to do.
Subclass A-l would have the court question the judgment of city council, and further it objects to the council’s legislation for the economic impact which the payment of nonprotestors’ claims might have on the city’s fisc. Since the nonprotestors’ claims are moral or equitable obligations, both of these contentions have been answered by the *266 Court of Appeals: “The extent to which moral and equitable claims against the city should be recognized is primarily for the City itself to determine * * * Constitutional local self-government should not be hamstrung by the courts for economic reasons.” (Matter of Evans v Berry, 262 NY 61, 71, supra; see, also, People ex rel. Eckerson v Board of Educ., 126 App Div 414, 418-419, supra.)
In summary, on the sole issue before me, I hold that the claims of nonprotestors are equitable or moral obligations of the City of Rochester and that the city has validly recognized them as such in enacting Ordinance No. 83-162 (May 10, 1983). Consistent with my order of October 9, 1981, consideration of the city’s refund plan as it might affect all parties shall be deferred pending the final determination of all subsequent appeals of the issue here decided; the final resolution of this issue being critical to the validity of the city’s refund plan. All counsel are requested to co-operate in expediting all further appeals so that this matter may return here without undue delay.
An order consistent with this decision should be prepared by co-ordinating counsel. Co-ordinating counsel should send a copy to all counsel and the original to the court.
All parties shall have five business days from the date of service of this order to comment in writing with a copy to the court. If any problems with the form of the order cannot be resolved, the court will make further direction.